# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Docket no. 2:18-cr-00063-GZS |
| YEHUDI PARDO, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON MOTION TO SUPPRESS

Before the Court is Defendant Yehudi Pardo's Motion to Suppress (ECF No. 423), as well as related amended Motions to Suppress (ECF Nos. 492 & 503) and a Memorandum in Support of these Motions (ECF No. 509). The Court held an evidentiary hearing on these Motions on September 18, 2019, at which the Government introduced eleven exhibits and the testimony of two witnesses and Defendant submitted a one-page affidavit (ECF No. 514). For reasons that follow, the Court now DENIES Defendant Pardo's Motions to Suppress (ECF Nos. 423, 492 & 503).

## I.     FACTUAL FINDINGS

On February 8, 2018, as part of an ongoing investigation of a Maine-based, drug-trafficking organization, this Court authorized wire interception under 18 U.S.C. § 2518 for a target telephone connected to Timothy Bellmore, a named co-defendant in this case. The multi-agency investigation was focused on suspected commercial marijuana cultivation and money laundering.

Lewiston Police Officer Brian Bourgoin, then on a federal detail with the Drug Enforcement Agency, was one of the investigators.

During the night hours of February 15, 2018, the wiretap surveillance picked up the following text exchanged between Bellmore's target phone and a phone number that was later associated with Pardo[1]:

> PARDO: How many minimum
> BELLMORE: For ?
> PARDO: Clone order
> PARDO: 250 min order
> BELLMORE: So mix em up

(Gov't Ex. 8.) As Officer Bourgoin explained, as it relates to marijuana cultivation, the term "clone" refers to a small, immature marijuana plant and 250 clones can be used to grow 250 mature marijuana plants.

On February 23, 2018, by way of a pole camera, agents observed a gray Toyota Tundra with a Massachusetts license plate arrive at one of Bellmore's places of business in Lewiston. Agents obtained registration information for this vehicle. After it left that location, Officer Brian Bourgoin followed the vehicle on to the Maine Turnpike and then visually confirmed that this vehicle was being operated by its registered owner, Pardo.

Also, on the evening of February 23, 2018, wiretap surveillance captured the following text exchange between Bellmore's phone and Pardo's phone:

> PARDO: Looking like 4 pizzas and 3000 pens for tomorrow
> BELLMORE: ok

(Gov't Ex. 9.) In a follow-up phone call on the evening of February 24, 2018, Pardo told Bellmore: "See you tomorrow morning. Four pizzas and 3,000 pens. . . . I'll probably be there before noon."

---

[1] The phone number, 617-834-6411, matches the number Pardo later gave Trooper Wilkerson during the 2/25/18 traffic stop. See Gov't Ex 7.

2

(Gov't Exs. 2-T & 10.) According to Officer Bourgoin, during the course of this investigation, two other targets were stopped in New Hampshire and had pizza boxes seized that contained marijuana extract known as "dabs" or "shatter." Thus, law enforcement believed the reference to "pizzas" related to marijuana extract, and "pens" referred to smoking cartridges containing marijuana extract liquid that are used for vaporizing.

As it turned out the following day, February 25, 2018, was an inclement weather day in Maine with freezing rain that resulted in the Maine Turnpike Authority reducing the speed limit on I-95 to 45 miles per hour. At approximately 12:30 PM, the wiretap captured a call from Pardo's phone to Bellmore acknowledging that the weather was "nasty" and indicating that his arrival would be delayed until approximately 3 PM. (Gov't Exs. 3-T & 11.)

Officer Bourgoin was conducting visual surveillance related to the Bellmore investigation on February 25, 2018. As a result of the just-described wiretap surveillance, Bourgoin was on the lookout for Pardo's vehicle, which he had followed two days earlier, in the area of the York toll plaza on I-95. After spotting Pardo's vehicle, he contacted Maine State Trooper Jodell Wilkinson, a canine officer who was patrolling the Maine Turnpike that day. Bourgoin advised her that they had probable cause to stop Pardo's vehicle. After hearing from Bourgoin, Trooper Wilkinson, then located in the northbound breakdown lane of the Turnpike around mile marker 32, activated her radar and captured Pardo's vehicle traveling at 66 miles an hour. She initiated a traffic stop.[2] For his part, Bourgoin confirmed that Wilkinson had stopped the target vehicle and then proceeded to a remote location to await an update from Wilkinson.

Wilkinson initially asked Pardo for license, registration, and insurance, which Pardo provided. Because Pardo had two barking dogs in his vehicle, Wilkinson requested that Pardo exit

---

[2] The entirety of the stop was captured on Trooper Wilkinson's dashboard camera. See Gov't Ex 1.

the vehicle to talk with her. In response to Wilkinson's initial questions, Pardo indicated he was bound for Independent Auto in Lewiston. Once a uniformed back-up officer arrived to assist, Wilkinson announced that she was going to conduct a K-9 sniff of Pardo's vehicle. Wilkinson's K-9 alerted on the passenger side of Pardo's vehicle. Wilkinson explained to Pardo that because her K-9 alerted on a portion of his truck, she would conduct a search of the vehicle. At that point, Pardo disclosed that he had a loaded firearm in his glove compartment. Before commencing the search, Wilkinson arranged for the removal of Pardo's two dogs from the passenger compartment. Ultimately, after a limited visual search, Wilkinson did not find any narcotics in Pardo's vehicle that would confirm the alert by her K-9.[3] She did locate a significant amount of currency, most of which was located in a satchel on the back seat, as well as the firearm in the glove compartment and, from the rear of the truck, a backpack with marijuana residue and a FoodSaver vacuum sealer. (See Gov't Exs. 4, 5 & 6.) Pardo estimated that the satchel contained approximately $30,000, and told Wilkinson that he intended to use the money to buy a jeep for his little sister.

After she completed her vehicle search, Wilkerson called Bourgoin from her cruiser to update him on the results of the search. Bourgoin directed her to seize the cash and firearm.[4] After receiving those instructions, Wilkinson exited her cruiser and explained to Pardo that she was seizing these two items. She secured the items and issued Pardo a property receipt. (See Gov't Ex. 7.) Once the stop was complete, Pardo and his dogs departed in his truck. Wilkinson then drove to meet Bourgoin in Saco and handed off the seized items to the DEA.

---

[3] As Trooper Wilkinson explained, her narcotics K-9 is trained to indicate only on crack, cocaine, methamphetamine and heroin.

[4] Government Exhibits 4 & 5 are photographs of these two seized items.

## II. DISCUSSION

The Fourth Amendment's prohibition against unreasonable searches and seizures generally forbids warrantless searches and seizures unless one of "a few specifically established and well-delineated exceptions" applies. Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967) ) (internal quotation marks omitted). Any evidence obtained from a warrantless search that does not fall into such an exception is subject to exclusion. See United States v. Tiru-Plaza, 766 F.3d 111, 115 (1st Cir. 2014). Where, as here, a defendant moves to suppress evidence seized without a warrant, the Government bears the burden of proving that an exception applies. United States v. Ramos-Morales, 981 F.2d 625, 628 (1st Cir. 1992). The applicable exception here is the automobile exception, which allows officers to "search an automobile without having obtained a warrant so long as they have probable cause to do so." Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018) (explaining the history and limitations of the automobile exception).

In an apparent recognition of the automobile exception, Defendant has clarified that he is not challenging the stop or the canine sniff of his vehicle on February 25, 2018.[5] Rather, Defendant initially argues that Trooper Wilkinson simply "did not have probable cause based on her own knowledge to seize the firearm and U.S. currency" from his vehicle. (Def. Mem. (ECF No. 509), PageID # 1558.) Relatedly, Defendant asserts that on the facts presented, the collective knowledge doctrine does not apply. Finally, Defendant argues that even if the collective knowledge of the entire investigation gives rise to probable cause, there was a "lack of both temporal and locational

---

[5] See Def. Opposition to Gov't Response (ECF No. 502), PageID # 1545 ("The defendant is not challenging the constitutionality of the stop or the canine sniff."). Beyond Defendant's concession, the Court finds that the February 25th stop and search were clearly lawful under the automobile exception. See, e.g., United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014) (affirming application of the automobile exception as allowing police to "seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband.")

5

nexus" to justify the seizure of "non-contraband items" from his vehicle. (Def. Mem. (ECF No. 509), PageID # 1560.) The Court addresses each of these arguments in turn.

As to the first argument, the Court declines Defendant's invitation to conduct a probable cause analysis of the seizure in this case that focuses only on the individual knowledge of the officer who executed the stop and vehicle search. Rather, governing precedent makes clear that this Court is to "apply the 'collective knowledge' principle when reviewing the existence of probable cause" and thereby "look to the collective information known to the law enforcement officers participating in the investigation rather than isolate the information known by the individual arresting officer." United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017), cert. denied, 138 S. Ct. 2593 (2018); see also United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999) (explaining that when reviewing probable cause "the focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation"). Here, the record readily supports a finding that Wilkerson was participating and involved with the investigation in question; this involvement began before she initiated the stop of Pardo's vehicle and continued until she transferred possession of the seized items to DEA. See, e.g., United States v. Rowe, 878 F.3d 623, 628 (8th Cir. 2017) (requiring only "some degree of communication" to impute collective knowledge of all law enforcement officers to an officer on the scene), cert. denied, 138 S. Ct. 1602 (2018).

In multiple respects, the Court concludes this case is factually analogous to United States v. White, 804 F.3d 132 (1st Cir. 2015). As in White, the record here contains a "pretextual speeding infraction" and a "canine sniff search," but the challenged seizure is "a straight-forward probable cause case" once the collective knowledge doctrine is applied. Id. at 138. Specifically, prior to the challenged seizure there was probable cause for law enforcement to believe that Pardo

was en route to finalize a pre-planned illegal distribution of drugs. "[D]etermining the existence vel non of probable cause requires a court to look at the objective facts, not at the actors' subjective intent." United States v. Sanchez, 612 F.3d 1, 6 (1st Cir. 2010) (analyzing probable cause under the plain view exception). The probable cause "standard is satisfied when the totality of the circumstances create a fair probability that . . . evidence of a crime will be found in a particular place." United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014) (internal citations and quotations omitted). The objective circumstances here included: (1) Pardo's recorded and observed interactions with Bellmore, who was suspected of drug trafficking; (2) his admission that he was carrying large sums of cash and a loaded handgun; and (3) the implausibility of his stated reason for his solo road trip to Maine in a storm.[6] See United States v. Dion, 859 F.3d 114, 132-133 (1st Cir. 2017) (noting that strange explanations for travel are relevant to probable cause determination); United States v. Reyes, 225 F.3d 71, 76 (1st Cir. 2000) (including the defendant's interaction with "suspected drug dealers" in probable cause calculus); United States v. Martinez-Molina, 64 F.3d 719, 726, 732 & n.5 (1st Cir. 1995) (affirming denial of motion to suppress that challenged seizure of cash from car). Having considered the totality of the circumstances, the Court readily concludes that law enforcement had probable cause to conclude that both the cash and the firearm found upon searching Pardo's vehicle were evidence of a crime.

To the extent that Defendant additionally argues that the probable cause did not provide a sufficient "nexus" between the two "non-contraband items" seized from Pardo and the crimes being investigated, the Court finds no merit in this argument. (Def. Mem. (ECF No. 509), PageID # 1560.) Here, there was "reliable information" regarding drug trafficking activity and "sufficient

---

[6] The Court finds it was implausible that Pardo was going to buy a jeep, as he told Wilkerson. Also, it was implausible that Pardo was actually on his way to buy pizzas and pens, as indicated in his text messages with Bellmore. The fact that law enforcement collectively possessed knowledge of these two different explanations further bolsters the implausibility of each explanation.

reason to believe" that Pardo's cash and firearm were evidence of that illegal activity. Sanchez, 612 F.3d at 5 (affirming warrantless seizure of motorcycle); see also United States v. Hernandez-Mieses, 931 F.3d 134, 140 (1st Cir. 2019) (affirming the warrantless seizure of cash, cellphones and gun as "common tools of the drug trade"). No additional particularized nexus was required to justify the seizure of these two items.

## III. CONCLUSION

For the reasons just stated, the Court hereby DENIES Defendant Pardo's Motions to Suppress (ECF Nos. 423, 492 & 503).

SO ORDERED.

                                                  /s/ George Z. Singal
                                                  United States District Judge

Dated this 26th day of September, 2019.